THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v* DOUGLAS S. ELLIS *et al.*, Defendants-Appellants.

Fourth District   No. 4—82—0494

Opinion filed March 24, 1983.—Rehearing denied April 14, 1983.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellants.

Edward Litak, State's Attorney, of Danville (Robert J. Biderman and Rebecca L. White, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Defendants were convicted of burglary. Ellis was sentenced to three years' probation and ordered to make restitution. Simmons was sentenced to four years' probation and also was ordered to make restitution. On appeal, defendants raise three issues: (1) Did the police have sufficient grounds to detain defendants pursuant to a *Terry* stop; (2) assuming *arguendo* that sufficient grounds for a *Terry* stop existed, was the subsequent detention of the defendants outside the scope of *Terry*; and (3) were defendants denied the effective assistance of counsel?

On February 22, 1982, an information was filed charging Douglas Ellis and Jerry Simmons with the offense of burglary. Defendants filed a motion to suppress, alleging that evidence and statements were obtained from them pursuant to a stop which was made without

either probable cause or a reasonably articulable suspicion. A hearing on the motion was held on April 8, 1982. Officer Calvin Showers testified that on February 19, 1982, at approximately 1:25 a.m., he noticed two men walking across the parking lot of the Holiday Square shopping center in Danville. None of the stores in the shopping center were open at that time of night. The men were between 100 and 200 feet from any of the stores in the shopping center and were walking directly east of a Wendy's restaurant. The men made no movement toward Wendy's nor did they look in the windows. Showers explained that there were residences bordering the area in which the men were walking. He stated that it was possible to cut through the parking lot for the purpose of getting to these residential areas.

Showers stated that he drove his police van toward the two men, stopped and asked them for identification. Defendants identified themselves and produced driver's licenses. Showers retained defendants' driver's licenses while he ran a warrant check. An alert tone was subsequently broadcast over the police radio which indicated that a warrant was pending on one of the defendants. At that point, Showers searched Simmons and found an 18-inch pry bar concealed in Simmons' trousers. Simmons was then handcuffed and transported to jail; Ellis was patted down and subsequently informed that he was free to leave.

Showers testified that later the same day he compared the pry bar to marks made on the door of Depke Welding during a prior burglary. Showers concluded that the pry marks on the door were made with a bar similar to the bar seized from the defendant. Showers then went to Ellis' residence along with Investigator Garrett of the Danville Police Department. Showers asked Ellis to accompany the officer to the station for questioning. Ellis agreed and went inside the residence to put on his shoes. Showers stated that Ellis told the officers to come in and wait while he got dressed. While in Ellis' apartment, the officers observed numerous tools and a Jack Daniels gift set in the apartment. Showers recalled that similar items had been mentioned in recent burglary reports; Ellis was then placed under arrest and taken to the police station.

Garrett testified that he interrogated Ellis and Simmons on the day of their arrest. Ellis admitted to committing several burglaries, but stated that he had acted alone. Simmons admitted to the same burglaries, but stated that Ellis had joined with him in these burglaries. Simmons also stated that he and Ellis stole a Pepsi-Cola vending machine from the Redwood Barber Shop. The trial court found that Officer Showers had an "articulable suspicion" sufficient to justify a

*Terry* stop on the defendants and denied their motion to suppress. Before defendants' bench trial on April 20, 1982, the trial court advised defendant Ellis as follows:

"THE COURT: You are also charged, together with a co-defendant in this case--I have previously advised you both and I would again advise you both at this time that in the event there is any conflict with having one lawyer represent each of you, you would be entitled to a lawyer free of conflict, or in effect, separate lawyers. Do you understand this?

MR. ELLIS: Yes.

THE COURT: It's my understanding that this matter is being called for trial this morning. The State had originally been granted a severance. The State has agreed with the defendants and each of them that the defendants will stand for trial as originally charged, cases will be consolidated for trial as far as both defendants are concerned; is that correct?

MR. RICHARD: Yes, Your Honor.

MR. NEY: Yes, Your Honor."

Richard Schomburg testified that on January 29, 1982, he noticed that certain items were missing from his office, including a decorative box of Jack Daniels whisky. He subsequently found pry marks on the service door of his building.

Keith Garrett testified that on February 19, 1982, he obtained statements from the defendants in which each admitted the burglary. The statements were introduced into evidence. Ellis admitted taking a case of Jack Daniels and other items from the premises. Following closing arguments by counsel, the trial court found the defendants guilty of the offense of burglary.

Defendants contend that the trial court erred in denying their motion to suppress because the evidence shows that Officer Showers lacked a sufficient basis to make a *Terry* stop.

In *Terry v. Ohio* (1968), 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, 1884, the Supreme Court held that a police officer may stop and question an individual only when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot \*\*\*." The officer must be able to point to specific facts which lead to inferences which would form a reasonable basis to justify the stop. Sections 107—14 and 108—1.01 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, pars. 107—14, 108—1.01) have codified the *Terry* rules. See *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488.

Officer Showers testified that he saw defendants walking across

the shopping center parking lot at 1:25 a.m. None of the stores in the shopping center were open at that hour. There are residences located close to the parking lot and it is possible to cut through the lot to get to a residential area. The court noted that a rash of burglaries and break-ins had recently occurred in the area.

In determining whether a *Terry* stop was justified, the court inquires whether, given the facts available to the officer at the time, a person of reasonable caution would believe the action taken to be appropriate. *Terry; People v. Corrigan* (1977), 45 Ill. App. 3d 502, 359 N.E.2d 1107.

*People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, supports the trial court's decision. In *McGowan*, two Peoria police officers were emerging from a city parking garage at about 12:50 a.m. when they saw two men emerging from an area next to the Hiram Walker building. Both men were wearing black clothing. One of the officers testified that the area had suffered a number of burglaries. A bar located about two blocks away from the scene was the only business still open and it closed at 1 a.m.

The court concluded that the evidence supported the officer's claim that he had a reasonable suspicion based on specific facts that criminal activity was afoot. Burglaries were not uncommon in the neighborhood; no stores or other establishments were open at that hour except for a bar, which was due to close in 10 minutes. Based upon these facts, the court held that the officer's inference of an imminent or recent burglary was reasonable and proper.

We hold that, based upon the facts testified to by Officer Showers at trial, Showers possessed a reasonably articulable suspicion that criminal activity was about to or had occurred. Therefore, he was justified in making a *Terry* stop and the trial court's denial of defendants' motion to suppress was not manifestly erroneous.

Defendants next contend that assuming that sufficient grounds existed to support a *Terry* stop, Officer Showers' detention of defendants while a warrant check was being made was beyond the scope of *Terry* and hence constituted an unlawful arrest.

The question of whether a police officer, having grounds for a valid *Terry* stop, may detain a person long enough to run a warrant check on that detainee has evidently not been considered by an Illinois court. The closest Illinois case is *People v. Canity* (1981), 100 Ill. App. 3d 135, 426 N.E.2d 591. In *Canity*, the Second District affirmed defendant's conviction for deviate sexual assault against a claim that an investigatory stop was not justified under section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par.

107—14). The court held that the police officers had not exceeded their authority under 107—14 by detaining defendant for 10 to 15 minutes while witnesses were brought to the scene and by requiring defendant to submit to several show-ups. The court found that, given the circumstances, the detention was not unreasonably long.

Professor LaFave, in his treatise on search and seizure, states that an officer may confer with others during a *Terry* stop to determine whether the person being detained is wanted so long as the detention remains reasonable in its scope. Professor LaFave writes:

> "It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale." 3 La-Fave, Search and Seizure sec. 9.2, at 36-37 (1978).

Courts in other jurisdictions have upheld warrant checks and similar police conduct pursuant to a *Terry* stop. (See *People v. Higbee* (1974), 37 Cal. App. 3d 944, 112 Cal. Rptr. 690; *State v. Bell* (Fla. App. 1980), 382 So. 2d 119; *Biggers v. State* (1982), 162 Ga. App. 163, 290 S.E.2d 159; *Clark v. State* (1977), 171 Ind. App. 658, 358 N.E.2d 761; *State v. Goebel* (1981), 103 Wis. 2d 203, 307 N.W.2d 915.) In *Biggers*, the court held that a *Terry* stop of two men in a car parked in a church parking lot was proper and did not become too intense and prolonged when the officer ran a check on the defendants through the National Crime Information Center computer.

Officer Showers' actions were reasonable and not unduly intrusive. After obtaining identification from both defendants, he ran a warrant check on them. He heard a tone over his radio, which was an

indication that a warrant was outstanding against one of the defendants. At that point, he searched Simmons, found a pry bar, and then placed Simmons under arrest. There is no evidence in the record that the warrant check took an unusually long time or was otherwise overly intrusive.

■ The authorities we have cited lead us to the conclusion that a warrant check pursuant to a *Terry* stop does not convert a stop into a full-fledged arrest. Therefore, the trial court's denial of the motion to suppress was correct; no probable cause need have been shown to justify the warrant check.

Defendants' final contention is that they were denied the effective assistance of counsel. Defendants were represented by the same court-appointed counsel. They maintain that this joint representation prevented counsel from giving his undivided loyalty to either of them.

■ By failing to raise the conflict of interest issue at trial, defendants have waived any error on appeal. An examination of the record reveals that the trial court apprised defendants of their rights to separate counsel if a conflict existed. No problems with the joint representation were brought to the attention of the trial court by the defendants or their attorney. Furthermore, the issue was not raised in the written post-trial motion. Based on those facts, the doctrine of waiver applies. *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.

The doctrine of plain error is also not applicable in this case. Defendants had waived a jury trial, so the trial judge was also the trier of fact. At the close of the State's evidence and before the trial judge read the statements, the trial judge asked counsel whether the statement of either defendant inculpated the other. When the court was informed that Simmons' statement inculpated Ellis, the court, anticipating a potential *Bruton* problem (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), ruled that it would disregard any reference to Ellis in Simmons' statement.

■ ■ The trial judge in a bench trial is presumed to have relied only on competent and admissible evidence. (*In re Prough* (1978), 61 Ill. App. 3d 227, 376 N.E.2d 1078.) Defendants have been unable to show any prejudice resulting from the joint representation and have failed to show that the trial judge relied on any improper evidence in reaching his verdict.

The judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

WEBBER, P.J., and MILLS, J., concur.