979 P.2d 1137

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Brandon SILVA, Defendant–Appellant.**

**No. 21392.**

Intermediate Court of Appeals of Hawai'i.

March 31, 1999.

Certiorari Granted May 5, 1999.

Jeffrey A. Hawk, Deputy Public Defender, on the brief for defendant-appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

In this appeal from a February 24, 1998 Judgment entered by the Circuit Court of the First Circuit (the circuit court), Defendant–Appellant Brandon Silva (Defendant) alleges that the circuit court reversibly erred when it convicted him of Promoting a Dangerous Drug in the Third Degree, a violation of Hawai'i Revised Statutes (HRS) § 712–1243 (1993 & Supp.1998),[1] and Unlawful Use of Drug Paraphernalia, a violation of HRS § 329–43.5(a) (1993).[2]

Specifically, Defendant contends that the circuit court improperly denied his motion to suppress evidence which had been recovered by police during a frisk of his person because: (1) the frisk occurred after the police illegally ordered Defendant to exit his car; (2) the police did not have cause to detain Defendant in order to run a warrant check, and therefore, any frisk conducted after Defendant's arrest on outstanding traffic warrants was unauthorized; and (3) there was insufficient evidence to support the circuit court's finding that the evidence would have been inevitably discovered by the police.

We affirm the judgment below.

## BACKGROUND

On August 13, 1997, a female who lived at 41–867 Laumilo Street in Waimānalo (Complainant) called the Honolulu Police Department (HPD) to report that a man was sleeping in his car which was parked on her front lawn. Complainant also relayed that the man had taken her trash can and placed it in his car. HPD Officers Ronald Lopes (Officer Lopes), Russell Oshiro (Officer Oshiro), and

---

1. Hawai'i Revised Statutes (HRS) § 712–1243 (1993 & Supp.1998) provides:

    **Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

    (2) Promoting a dangerous drug in the third degree is a class C felony.

    (3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the dis-

cretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

2. HRS § 329–43.5(a) (1993) provides:

    It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

Baron Lee (Officer Lee) were directed to investigate the complaint.

At a February 2, 1998 hearing on Defendant's Motion to Suppress Evidence, Officer Lopes testified that when he arrived at the Laumilo Street address, he spoke with Complainant, who pointed to a male, later identified as Defendant, who was sleeping in the reclined driver's seat of his car which was parked between two trees on Complainant's front lawn. Complainant informed Officer Lopes that she had retrieved her trash can from Defendant's car while Defendant was sleeping.

Officer Lopes testified that he subsequently awoke Defendant by calling out "hey, hey" and reaching through the open driver's window to shake Defendant. Officer Lopes then asked Defendant for some personal identification. Defendant replied that he did not have any identification but that his name was Brandon Silva. Officer Lopes stated that because there was "a lotta stuff in the car ... tools, clothing, bags of clothing, [which] pretty much covered the front seat and the back hatch area[,]" he felt "somewhat insecure about having [Defendant] stay in the car." He therefore asked Defendant to step out of the car,[3] did a routine warrant check, discovered that Defendant had three outstanding traffic warrants, had dispatch confirm the warrants, and placed Defendant under arrest based on the traffic warrants.

Officer Lopes further testified that after the arrest, he handcuffed Defendant, then conducted a patdown of him. Upon frisking Defendant's right side, he discovered three lighters in the right front pocket of Defendant's jeans. Thereafter, according to Officer Lopes, the following transpired:

A ... I removed the lighters and I turned [Defendant] to his left, and before I did the patdown, I could see the bulb of a glass pipe was in his left pocket, and in that pipe had crystal residue resembling crystal methamphetamine.

Q So, did you recover the lighters?

A Yes.

Q And after making observations of the pipe, did you recover the pipe?

A Yes, I did.

Q And how did you do so?

A I reached in and I pulled it out of his, he had jeans on, and I pulled it out of his pocket.

Q Did you have to dig into his pocket to pull it out?

A It was a little tight, but, I mean it was right there, I can just use my two fingers to pull it out.

* * *

Q Where was the pipe in relation to his pants pocket?

A It was like right at the edge of the, I guess you would consider the outer edge of the pocket. It was right about there.

Q So, you could actually see it?

A Yeah, the pocket was open about an inch and a half or maybe half an inch or something.

Officer Lopes further recalled that when he "lifted" the pipe from Defendant's pocket, a clear packet of what appeared to be crystal methamphetamine was attached to the pipe.

Defendant's version of what happened after he was awakened by Officer Lopes on the day in question differed slightly from Officer Lopes's version. Defendant testified that after he was awakened, Officer Lopes asked him who he was and asked him to step out of the car. Officer Lopes also mentioned something about a rubbish can that was in Defendant's car, but Defendant "didn't know what they meant cause when I got up, there was no rubbish can in my car." As to the circum-

---

3. Officer Ronald Lopes (Officer Lopes) testified as follows:

Q Now, you had mentioned that you asked [D]efendant out of the car?

A Yes.

Q Was this before or after you ascertained his name and did the warrant check?

A It was right after I ascertained his name, and he had a lot of stuff in the car, and I asked

him out for my—I don't know what was in the car, so I just asked him to step out.

Q So, you felt somewhat insecure about having him stay in the car, so you asked him out of the car?

A Yeah, cause there was a lot of stuff within his reach.

stances of his arrest for the outstanding traffic warrants, Defendant testified:

Q When they told you you were being placed under arrest for traffic warrants, did you understand that?

A Yes, I had told him before the warrants, before he even called that I had traffic warrants.

Q Okay. So, he confirmed them and then he —

A Yeah.

Regarding the frisk which occurred after his arrest, Defendant testified, in relevant part, as follows:

Q Okay. What happened next?

A He had asked me if I had anything in my pockets?

Q Who's he?

A Officer Lee.

Q Okay. What did you do in response to that question?

A I said, I didn't know. Then I put my hands in my pocket, I pulled out a pack of cigarettes, two lighters, and I had two pipes in my pocket.

Q And what kind of pipes were they?

A They were the same one that was in my left hand pocket.

Q Okay. So, they were drug pipes?

A Yes.

Q Okay. You pulled those out of your right pocket and handed those to Officer Lee?

A I proceeded to hand him the cigarettes which they took and the two lighters, and I offered the two pipes to him. He then instructed me to throw them on the ground and step on them, which I did.

After that occurred, Officer Lopes had handcuffed me, placed me under arrest. I wasn't able to go into any other pockets to get out any contents that was in there because I was already handcuffed.

Q Okay. And what happened next?

A Then Officer Lopes tapped the back pockets and reached in both pockets, left and right, pulled out lighters that I had, that I were [sic] gonna fix, they weren't working or anything, but one was in my right and one was in the back pocket. He

took out those two, and then he reached in to [sic] my left hand pocket where he pulled out the contents.

Q Okay. Now, when you say he reached into your pocket, did he pat the pocket first?

A No, no, he came from behind me and just stuck his hand in.

Q Was that the pocket you had not pulled anything out yourself?

A No, I didn't get a chance to take—I would have handed the contents to them willingly. I didn't get a chance to because I was placed under arrest and handcuffed.

\* \* \*

Q Let me ask you a question: looking down into your pocket, could you see the pipe that they're talking about?

A No. They couldn't see anything that they're talking about. You would have to have gone into the pockets like I did with my right hand. I wasn't even aware that it was in there.

Q So, he pulled it out. Did he say anything when he pulled it out?

A Yeah, he said, look what we got here.

Q And did you say anything in response to that?

A Yeah, I told him that I don't think that was mines [sic].

On February 20, 1998, the circuit court orally denied Defendant's motion to suppress, stating as follows:

Let me first state very clearly for the record what I find to be the course of events. And I don't think that—that there's that much controversy about most of it, but there is one part that I think would be important for me to state clearly. And that is that the—upon approach by Officer Lopez [sic], the officer woke up [Defendant], asked for his name and then asked him out of the car for a police—for reasons of police safety and then proceeded with the warrant check. And simultaneous of all of that, as testified to by [Defendant], that he told Officer Lopez [sic] that there would be traffic warrants

even before Officer Lopez [sic] called dispatch to confirm it.

The [c]ourt will find that this is not a classic, quote, traffic stop simply because there is a—there is a car involved and there is an order out and, therefore, does not find that the holding or the policies behind State versus Kim would apply.

The [c]ourt also declines to make a ruling where there cannot be simultaneous investigation because—and—and this is responding to—to your argument, [defense counsel]—it would seem to me that an argument and my adoption of an argument that: Well, at the end, no charges would be brought because of the trespass or the emptying pockets would lead to this anomalous situation where suspects would merely—not merely, but would have to be detained until investigation, short or long, be completed before anything else can be done. And—and that one, I don't think that makes a whole lot of common sense.

But, two, I am unwilling to fetter police procedure to that extent.

And so what I find is that at the time of the approach, seizure, asking—well, not asking, ordering out of [Defendant] by Officer Lopez [sic], that there was reasonable suspicion based on the call of dispatch, based on the presence of the homeowner right there ready to assist in the investigation.

Everything else would then follow that finding, either along the lines of the arguments made by [the deputy prosecutor] or as he further notes, the alternative legal principle of inevitable discovery.

Now, with respect to inevitable discovery, what I do specifically find is the—the State has established by clear and convincing evidence that within a very short time the warrants would have been confirmed and [Defendant] would have been lawfully arrested on the strength of those outstanding warrants.

The [c]ourt will also find that the State has proven by clear and convincing evidence that during an in—an inventory search, that the contents of [Defendant's] pockets would have been revealed. And the [c]ourt will also find that there's nothing in the record to suggest that the contraband was in a closed container.

A written order denying Defendant's motion to suppress is not part of the record on appeal.

On February 24, 1998, Defendant entered a guilty plea, conditioned on his right to appeal the circuit court's denial of his motion to suppress. Judgment was entered the same day, and Defendant was sentenced to an indeterminate term of imprisonment for five (5) years, with a mandatory minimum term of three (3) months.

## STANDARD OF REVIEW

■ The circuit court's ruling on a motion to suppress is reviewed *de novo* to determine whether, as a matter of law, the ruling was "right" or "wrong." *State v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997).

■ However, the circuit court's findings of fact, upon which the court's ruling rests, are reviewed to determine whether they are clearly erroneous. *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks omitted).

## DISCUSSION

### A. *The Exit Order*

In *Kernan v. Tanaka*, 75 Haw. 1, 856 P.2d 1207 (1993), the Hawai'i Supreme Court held that where police stop a driver for committing a traffic violation, they may not order the driver to exit the driver's vehicle unless they "have at least a reasonable basis of specific articulable facts to believe a crime has been committed.... Probable cause is, therefore, not required to support an exit order." *Id.* at 38, 856 P.2d at 1225–26 (quotation marks, emphasis, and internal citation omitted). In *Kernan,* a police officer had observed the defendant driving forty-five miles per hour in a twenty-five-mile-per-hour zone while weaving out of his traffic lane and

into oncoming traffic lanes. *Id.* at 39, 856 P.2d at 1226. The supreme court concluded that "[t]hese traffic violations and the totality of the circumstances surrounding them provided the officer with a reasonable factual basis to believe that the crime of [driving under the influence of intoxicating liquor] was being committed." *Id.* Therefore, the supreme court added, "the traffic stop was justified and ... the officer was permitted to invite [the defendant] to exit his vehicle for further investigation." *Id.*

More recently, in *State v. Vallesteros,* 84 Hawai'i 295, 303, 933 P.2d 632, 640 (1997), the supreme court held that police officers are authorized "to order alleged violators out of their vehicles in the case of traffic-related *criminal* offenses, but not in the case of traffic violations or when statutorily required to issue a citation." (Emphasis in original.) For example, the court said an officer may order a driver out of his or her car for driving without a license, a misdemeanor,

and therefore a crime as defined in HRS § 701–107 (1993),[4] but not for failing to have a license in his or her possession, a violation and therefore not a crime as defined in HRS § 701–107. *Id.*

This case did not involve a situation in which Defendant was stopped by police for committing a traffic-related offense. We see no reason, however, why the exit order standard articulated in *Kernan* and *Vallesteros* should not apply where police have reasonable suspicion to believe that a crime has been committed by a defendant in a parked car.

It is undisputed that Officers Lee, Lopes, and Oshiro were dispatched to the Laumilo Street address to investigate Complainant's report of (1) a possible trespass[5] by Defendant, who was sleeping in his car which was parked in Complainant's front yard; and (2) a possible theft[6] by Defendant of Complainant's trash can. When the officers arrived at

---

4. HRS § 701–107 (1993) provides, in relevant part:

   **Grades and classes of offenses.** (1) An offense as defined by this Code or by any other statute of this State for which a sentence of imprisonment is authorized constitutes a crime. Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors. Felonies include murder in the first and second degrees, attempted murder in the first and second degrees, and the following three classes: class A, class B, and class C.

   (2) A crime is a felony if it is so designated in this Code or if persons convicted thereof may be sentenced to imprisonment for a term which is in excess of one year.

   (3) A crime is a misdemeanor if it is so designated in this Code or in a statute other than this Code enacted subsequent thereto, or if it is defined in a statute other than this code which provides for a term of imprisonment the maximum of which is one year.

   (4) A crime is a petty misdemeanor if it is so designated in this Code or in a statute other than this Code enacted subsequent thereto, or if it is defined by a statute other than this Code which provides that persons convicted thereof may be sentenced to imprisonment for a term of which the maximum is less than one year.

   (5) An offense defined by this Code or by any other statute of this State constitutes a violation if it is so designated in this Code or in the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty, is authorized upon conviction or if it is defined by a statute other than this Code which provides that the offense shall not constitute a

crime. A violation does not constitute a crime, and conviction of a violation shall not give rise to any civil disability based on conviction of a criminal offense.

   (6) Any offense declared by law to constitute a crime, without specification of the grade thereof or of the sentence authorized upon conviction, is a misdemeanor.

   (7) An offense defined by any statute of this State other than this Code shall be classified as provided in this section and the sentence that may be imposed upon conviction thereof shall hereafter be governed by this Code.

5. Pursuant to HRS § 708–815 (1993),

   (1) A person commits the offense of simple trespass if the person knowingly enters or remains unlawfully in or upon premises.

   (2) Simple trespass is a violation.

   HRS § 706–640 (Supp.1998) provides that a person convicted of a violation "may be sentenced to pay a fine not exceeding ... $1,000[.]"

6. Pursuant to HRS § 708–833 (1993),

   (1) A person commits the offense of theft in the fourth degree if the person commits theft of property or services of any value not in excess of $100.

   (2) Theft in the fourth degree is a petty misdemeanor.

   A person convicted of a petty misdemeanor may be sentenced "to pay a fine not exceeding ... $1,000[,]" HRS § 706–640 (Supp.1998), and "to imprisonment for a definite term to be fixed by the court and not to exceed ... thirty days[.]" HRS § 706–663 (1993).

the scene, Complainant was present and pointed out Defendant, who, as reported, was asleep inside his car which was parked on Complainant's front lawn. Complainant also stated that she had retrieved her trash can from Defendant's car, thus confirming the facts she had reported when she initially called the police.

■ Given the totality of the circumstances, we are convinced that the circuit court correctly held that the officers "had reasonable suspicion based on the call of dispatch, based on the presence of the homeowner right there ready to assist in the investigation" to believe that simple trespass was occurring and that a theft in the fourth degree had taken place. Since theft in the fourth degree is a petty misdemeanor, a crime as defined in HRS § 701–107, the police were permitted, under the exit order standard articulated in *Kernan* and *Vallesteros*, to order Defendant to exit his car so they could further investigate the situation.

### B. *The Warrant Check*

Defendant contends that although the police could have investigated him for the specific and limited objective of issuing a citation for a parking violation, their "further intrusive act of calling in a warrant check ... amounted to an unconstitutional search or seizure." We disagree.

### 1.

As discussed above, the police had "at least a reasonable basis of specific articulable facts to believe a crime [had] been committed" when they showed up at the Laumilo Street address. *Kernan*, 75 Haw. at 38, 856 P.2d at 1225.

Moreover, based on the initial report of Complainant to HPD, her identification of Defendant at the scene, and her confirmation of the facts reported when she called the

7. Pursuant to HRS § 803–5 (1993),
    (a) A police officer or other officer of justice, may, without warrant, arrest and detain for examination any person when the officer has probable cause to believe that such person has committed any offense, whether in the officer's presence or otherwise.
    (b) For the purposes of this section, *a police officer has probable cause to make an arrest*

police, the facts and circumstances as known to Officer Lopes were sufficient to warrant a reasonable police officer to believe that Defendant had committed fourth degree theft and was committing simple trespass, thus establishing probable cause to arrest or cite Defendant for said offenses.[7]

Pursuant to HRS § 803–6 (1993),

**Arrest, how made.** ... (b) *In any case in which it is lawful* for a police officer *to arrest a person without a warrant for a* misdemeanor, *petty misdemeanor or violation, the police officer may, but need not, issue a citation in lieu of the requirements of (a), if the police officer finds and is reasonably satisfied that the person:*

(1) Will appear in court at the time designated;

(2) *Has no outstanding arrest warrants which would justify the person's detention or give indication that the person might fail to appear in court;* and

(3) That the offense is of such nature that there will be no further police contact on or about the date in question, or in the immediate future.

\* \* \*

(Emphases added.)

■ In this case, since the police had probable cause to arrest Defendant without a warrant for theft in the fourth degree, a petty misdemeanor, and simple trespass, a violation, HRS § 803–6 authorized them to cite, rather than physically arrest, Defendant for said offenses, if, among other things, Defendant did not have any outstanding arrest warrants. The police were therefore authorized to conduct a warrant check to determine whether Defendant had outstanding warrants and thus qualified for a citation arrest.

*when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that a crime has been or is being committed.*
(Emphasis added.)

## 2.

We note, moreover, that even in temporary investigative stop situations, which may be justified on a lesser "reasonable suspicion" rather than "probable cause" standard, the United States Supreme Court has seemingly approved of the use of warrant checks to determine whether the individual being temporarily detained is "wanted." In a footnote in *Michigan v. Summers*, 452 U.S. 692, 701, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the Supreme Court quoted with approval the following passage from Professor LaFave's treatise on the Fourth Amendment:

It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. *Sometimes the officer will communicate with others, either police or private citizens, in an effort* to verify the explanation tendered or *to confirm the identification or determine whether the person of that identity is otherwise wanted.* Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale.

*Id.* at 701 n. 12, 101 S.Ct. 2587 (quoting 3 W. LaFave, *Search and Seizure*, § 9.2, at 36–37 (1978) (emphases added)).

Additionally, courts in other jurisdictions have generally upheld the validity of brief warrant checks during valid investigatory stops. *See, e.g., People v. H. J.*, 931 P.2d 1177, 1182 (Colo.1997) (since officers had reasonable suspicion that car was stolen, they had basis for stopping and questioning car's occupants and detaining them in order to check for outstanding arrest warrants; "[s]uch detention is brief and minimally intrusive"); *State v. Bell*, 382 So.2d 119, 120 (Fla.Dist.Ct.App.1980) (during lawful *Terry* stop, police officers were authorized to ascertain if there was an outstanding warrant for defendant's arrest); *Biggers v. State*, 162 Ga.App. 163, 290 S.E.2d 159, 160 (1982) (*Terry* stop of two men in car parked in church parking lot was proper and did not become too intense and prolonged when officer ran check on defendant's out-of-state license through the National Crime Information Center (NCIC) computer); *People v. Ellis*, 113 Ill.App.3d 314, 68 Ill.Dec. 885, 446 N.E.2d 1282, 1286 (1983) (detention of burglary suspects to conduct an outstanding warrants check was reasonable and not unduly intrusive); *State v. DeMasi*, 448 A.2d 1210, 1213 (R.I.1982) (where officer lawfully stopped a vehicle containing defendants based on his reasonable suspicion that defendants were engaged in criminal activity, "it was entirely appropriate for the officer to detain [defendants] further for the brief time necessary to conduct an NCIC warrant check.... [W]e do not consider the five-minute warrant check an unreasonable intrusion on the [defendants'] Fourth Amendment rights"); *State v. Madrigal*, 65 Wash.App. 279, 827 P.2d 1105, 1107 (1992) (after lawful stop of suspect, who was engaged in a "heated argument" with a woman, it was proper for a police officer to ask suspect for identification and then detain suspect pending the results of a portable radio check to police headquarters to determine if suspect had outstanding warrants, which took two minutes).

## 3.

Finally, the record reveals that Defendant himself divulged to the officers that he had outstanding warrants. At least one court has held that a warrant check is justified under such circumstances. *See United States v. Corral*, 823 F.2d 1389, 1393 (10th Cir.1987) (holding that where suspect informed officers "that he had been charged at an earlier date with a firearms violation, the

officers were amply justified in running the NCIC check to determine if [suspect] was a fugitive").

### 4.

Defendant cites *State v. Rife*, 133 Wash.2d 140, 943 P.2d 266 (1997), in support of his contention that a warrant check on Defendant was unconstitutional.

In *Rife*, a police officer stopped a pedestrian for jaywalking, a non-criminal traffic infraction. After obtaining identification from the pedestrian, the officer conducted a routine radio check for outstanding warrants against the pedestrian, a process which lasted five to ten minutes, then waited for verification that the pedestrian had two outstanding warrants, a process which lasted another five to ten minutes. The officer never cited the pedestrian for the jaywalking infraction but did arrest the pedestrian for the two warrants determined to be outstanding during the warrant check. During a search incident to the pedestrian's arrest on the outstanding warrants, the officer discovered a bindle of heroin in the pedestrian's pocket. Based upon this discovery, the pedestrian was charged with and subsequently convicted of unlawfully and feloniously possessing a controlled substance and narcotic drug.

Washington had a statute, Revised Code of Washington 46.61.021, which specifically provided:

(1) Any person requested or signaled to stop by a law enforcement officer for a traffic infraction has a duty to stop.

(2) Whenever any person is stopped for a traffic infraction, the officer may detain that person for a *reasonable period of time necessary to identify the person, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction.*

(3) Any person requested to identify himself [or herself] to a law enforcement officer pursuant to an investigation of a traffic infraction has a duty to identify himself [or herself], give his [or her] current address, and sign an acknowledgment of receipt of the notice of infraction.

*State v. Rife*, 943 P.2d at 268 (emphasis in original). In addition, a Seattle Municipal Code ordinance contained almost identical language to the foregoing statute.

The Washington Supreme Court held that because the statute and ordinance provided that the police may detain a person arrested for a traffic infraction only to (1) identify the person; (2) check the status of the person's license, insurance identification card, and the vehicle's registration; and (3) complete and issue the citation, the police lacked statutory authority to run a warrant check after stopping the pedestrian for jaywalking. The court concluded, therefore, that the heroin seized from the pedestrian's person had to be suppressed. *Id.* at 271.

Defendant points out that like Washington, Hawai'i has a statute, HRS § 291C–164 (1993),[8] which sets forth the procedure upon arrest of a person for violation of the traffic laws. Defendant asserts that because the Hawai'i statute does not specifically allow a police officer to run a warrant check on a defendant arrested for a traffic infraction, Officer Lopes improperly ran the warrant check on Defendant in this case.

The facts in this case, however, are distinguishable from *Rife*. It is undisputed that when the police officers were dispatched to Complainant's property, it was for the purpose of investigating a possible trespass and theft by Defendant. Defendant was not, as in *Rife*, stopped or pulled over for a non-criminal traffic-related infraction. Therefore, HRS § 291C–164 is not applicable to the present situation, and we need not decide whether the statute prohibits a police officer

---

8. HRS § 291C–164 (1993) states as follows:
  **Procedure upon arrest.** Except when authorized or directed under state law to immediately take a person arrested for a violation of any of the traffic laws before a district judge, any authorized police officer, upon making an arrest for violation of the state traffic laws shall take the name, address, and driver's license number of the alleged violator and the registered license number of the motor vehicle involved and shall issue to the driver in writing a summons or citation, hereinafter described, notifying the driver to answer to the complaint to be entered against the driver at a place and at a time provided in the summons or citation.

from conducting a warrant check on a defendant stopped for a non-criminal traffic-related infraction.

### C. *The Inevitable Discovery Ruling*

After the police had conducted the warrant check and discovered that warrants were outstanding for Defendant's arrest, they arrested Defendant on the outstanding warrants, conducted a search incident to arrest, and recovered the evidence which Defendant sought to suppress. The circuit court did not enter any findings as to the validity of this search and therefore did not resolve the credibility issue presented by the conflicting testimonies of Officer Lopes and Defendant regarding whether the seized evidence was in plain view. Instead, the circuit court concluded that the evidence would have inevitably been discovered during an inventory search of Defendant conducted upon his arrival and booking at the police station.

#### 1.

■ Under the inevitable discovery exception to the exclusionary rule, evidence recovered from an otherwise illegal search is not suppressed if the evidence would have been "inevitably discovered" by the police via lawful means. *State v. Lopez*, 78 Hawai'i 433, 896 P.2d 889 (1995). The Hawai'i Supreme Court has recognized, for example, that "if in the course of a lawful search incident to arrest the police inadvertently discover evidence of a crime other than that for which the arrest was made," the police are not prohibited "from seizing it and subsequently using it as evidence against the arrestee." *State v. Kaluna*, 55 Haw. 361, 372, 520 P.2d 51, 60 (1974). The rationale for allowing the inevitable discovery exception is that it "is a sound principle, which prevents the setting aside of convictions that would have been obtained in the absence of police misconduct[.]" *Lopez* at 451, 896 P.2d at 907.

In contrast to the United States Supreme Court, which requires the prosecution to sat-isfy the preponderance of evidence burden of proof before allowing evidence to be admitted under the inevitable discovery rule, *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Hawai'i Supreme Court "require[s] the prosecution to present clear and convincing evidence that any evidence obtained in violation of article I, section 7[9] [of the Hawai'i State Constitution], would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery exception to the exclusionary rule." *Lopez*, 78 Hawai'i at 451, 896 P.2d at 907. The supreme court noted that "clear and convincing evidence means such evidence as will produce in the mind of a reasonable person a firm belief as to the facts sought to be established." *Id.* at 451 n. 30, 896 P.2d at 907 n. 30 (internal quotation marks and brackets omitted).

■ In this case, the circuit court concluded that the State of Hawai'i (the State) had established, by clear and convincing evidence, that the contents of Defendant's pockets would have been revealed in an inventory search based on a finding that "there's nothing in the record to suggest that the contraband was in a closed container." Based on our review of the record, we concur with the circuit court's conclusion that the State met its burden of proof.

#### 2.

The permissible limits of an inventory or pre-incarceration search were outlined by the Hawai'i Supreme Court in *Kaluna, supra.* In *Kaluna*, a woman defendant suspected of participating in an armed robbery was arrested and taken to the police station to be searched by a police matron. Before the defendant was actually searched, however, she handed to the matron a tissue which was folded in a square. Although the matron admitted that she "had no idea" what was inside the folded tissue, she opened it up and

---

9. Article I, section 7 of the Hawai'i State Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, hous-es, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated[.]"

discovered four red capsules, subsequently determined to be Seconal, a barbiturate. The defendant was subsequently charged with the unlawful possession of these capsules.

The supreme court held that the capsules had to be suppressed. Rejecting the State's argument that the capsules were properly recovered during a pre-incarceration or inventory search, the supreme court stated that "[w]hile the police have valid reasons to conduct a limited pre-incarceration search, ... such a search should be no broader than necessary in light of those reasons." *Id.* at 373, 520 P.2d at 61. The supreme court then defined the permissible parameters of an inventory search as follows:

> [T]he police have full authority to prohibit the entry of weapons, drugs or other potentially harmful items into jail. To this end, they may require internees to surrender *any* possible repositories for such items prior to incarceration. However, a concomitant of this wide authority to prohibit the entry of personal belongings which may harbor forbidden contents is a complete *absence* of authority to conduct a general exploratory search of the belongings themselves. This absence of authority derives from the lack of any justification for such a further search inherent in the exception itself. Once the internee has turned over his [or her] possessions for safekeeping it is no longer possible that he [or she] may take them into jail.

*Id.* at 373–74, 520 P.2d at 61 (emphases added).

In this case, Officer Lopes testified that when he was frisking Defendant in a search incident to the lawful arrest, he saw in plain view in Defendant's left pocket, which was open about an inch and a half, the bulb of a glass pipe with crystal residue resembling crystal methamphetamine. As Officer Lopes lifted the pipe out of Defendant's pocket, the clear plastic packet of crystal methamphetamine slid out. Although Defendant denies that the glass pipe and the packet were in plain view, he does not contest that the objects were in his pocket. Since, as the circuit court found, there was no evidence that ei-

ther object was in a closed container, it is clear under *Kaluna* that the objects would have been discovered in an inventory search.

Thus, it was not clearly erroneous for the circuit court to conclude that the State produced clear and convincing evidence that the pipe and packet would have been retrieved under the inevitable discovery rule.

## CONCLUSION

In light of the foregoing discussion, we affirm both the circuit court's order denying Defendant's Motion to Suppress Evidence and its February 24, 1998 Judgment entered against Defendant.

Concurring Opinion of ACOBA, J.

I concur in the result.

I note that the prerequisite for a warrant check under Hawai'i Revised Statutes § 803–6 (1993) is a "lawful" arrest. No officer here testified that Defendant–Appellant Brandon Silva (Defendant) was ordered to exit the vehicle for the purpose of an arrest. Officer Ronald Lopes (Officer Lopes), the arresting officer, testified that it was "up to [the complainant]" as to whether Defendant would be arrested, and that he ordered Defendant to exit the vehicle because there "was a lotta stuff in [Defendant's] car" and he felt "insecure." Officer Lopes testified Defendant was placed under arrest *after* and as a result of the warrant check.

I do not read the majority opinion as generally allowing detention for purposes of a warrant check once the purpose for which a seizure is made has been satisfied. Conceivably, here, the police had sufficient information to detain Defendant for investigation of simple trespass and theft, although he was neither subsequently arrested nor charged for either offense.

In any event, I do not believe recovery of the contraband was the fruit of Officer Lopes' exit order. Defendant testified that after he exited the car he volunteered the information that he had traffic warrants. Accordingly, in my view, Defendant was the person who provided the basis for, and thus

invited his further detention for a warrant check. The contraband was recovered following the arrest on the warrants, and validly so, as incident to arrest under the police version of the events, or pursuant to the inevitable discovery rule under Defendant's recounting of the episode.