205 P.3d 628

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Edward S. DAWSON, Defendant–Appellant.**

**No. 28406.**

Intermediate Court of Appeals of Hawai'i.

April 8, 2009.

As Corrected May 1, 2009.

Phyllis J. Hironaka, Deputy Public Defender, on the briefs, for Defendant–Appellant.

Brian R. Vincent, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

NAKAMURA and FUJISE, JJ., and FOLEY, Presiding Judge, Dissenting.

Opinion of the Court by NAKAMURA, J.

A computer check for warrants revealed an outstanding warrant for Defendant–Appellant Edward S. Dawson (Dawson). Upon encountering Dawson, a police officer detained Dawson for a few minutes to confirm that the physical paper warrant was still in the files of law enforcement. During this detention, the officer observed Dawson remove a glass pipe, commonly used to smoke crystal methamphetamine, from Dawson's pocket and place it in a nearby package. Once the outstanding warrant was confirmed, Dawson was arrested on the outstanding warrant and for possession of the pipe. We hold that Dawson's detention was lawful and that the trial court properly denied Dawson's motion to suppress the pipe, which was found to contain methamphetamine.

Dawson appeals from the Judgment of Conviction and Sentence (Judgment) filed on January 17, 2007, in the Circuit Court of the First Circuit (circuit court).[1] Plaintiff–Appellee State of Hawai'i (State) charged Dawson by complaint with 1) promoting a dangerous drug in the third degree, for possessing methamphetamine (Count I) and 2) posses-

sion with intent to use drug paraphernalia (Count II). The charges were based on the methamphetamine pipe observed by the officer while Dawson was detained and later recovered after Dawson's arrest. After a jury-waived trial based on stipulated evidence,[2] the circuit court found Dawson guilty on both counts. The circuit court sentenced Dawson to five years of imprisonment on each count, to be served concurrently with each other and with a five-year term of imprisonment imposed in a separate case. The circuit court also imposed a one year mandatory minimum term on Count I based on Dawson's status as a repeat offender.

On appeal, Dawson argues that "[t]he existence of a 'possible warrant' did not constitute reasonable suspicion enabling the police to detain Dawson, thus the lower court erred in denying Dawson's motion to suppress the pipe containing residue which the police observed during his illegal detention." For the reasons set forth below, we disagree with Dawson's argument and affirm the circuit court's Judgment.

## BACKGROUND

■ Prior to trial, Dawson filed a motion to suppress evidence, seeking to suppress a three-inch glass pipe and .075 grams of white residue containing methamphetamine found within the pipe. Dawson alleged that this evidence was the fruit of a detention that was unlawful because it was not supported by reasonable suspicion. The following evidence is pertinent to our review of the circuit court's denial of Dawson's suppression motion.[3]

### I.

On October 14, 2005, around noon, Honolulu Police Department (HPD) dispatch directed officers to respond to 1421 Alapai Street

---

1. The Honorable Michael A. Town presided.

2. The parties agreed to permit the circuit court to decide the case based on evidence presented at prior hearings supplemented by additional exhibits admitted without objection.

3. In reviewing the circuit court's denial of a motion to suppress evidence, we consider both the record of the hearing on the motion to suppress and the record of the trial. *State v. Kong*, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App. 1994). In addition to the suppression hearing evidence, we therefore consider the evidence presented at trial, which included police reports, the outstanding arrest warrant for Dawson, and the preliminary hearing testimony of Officer Robyn Pacheco.

to investigate the report of an outstanding stolen vehicle parked there. The address was that of an apartment complex referred to as Punchbowl Housing. Both HPD Officers Robyn Pacheco (Officer Pacheco) and Leo Kang (Officer Kang) responded to the call from dispatch.

While en route, Officer Kang asked dispatch to perform a warrant check on Edward Dawson. Officer Kang requested the warrant check because four or five months earlier, Officer Kang had participated in a car theft investigation in which Dawson was a suspect that involved the same 1421 Alapai Street address. Officer Kang knew that Dawson's girlfriend, Sandra Domingo (Domingo), lived in an apartment at that address. During the prior investigation, Officer Kang located a stolen truck in the parking lot at 1421 Alapai Street and then unsuccessfully chased after a man who ran from Domingo's apartment. When Officer Kang returned, the stolen truck was gone, and Domingo admitted that Dawson had taken the truck.

Officer Kang also recalled another incident in which he pulled over a van, apparently for expired registration and safety inspection certificates. Dawson, who had been driving the van, jumped out and ran away, and Domingo also emerged from the van.

After the stolen-truck incident, Officer Kang kept running Dawson's name in the HPD computers and frequently went back to the area in an attempt to find Dawson. Officer Kang noticed that there was a "possible warrant" for Dawson about two weeks before

4. The actual warrant was issued on October 3, 2005, eleven days before the events at issue in this case.

5. UCPV is an acronym for the crime of unauthorized control of a propelled vehicle, commonly known as automobile theft.

6. At Dawson's preliminary hearing, Officer Pacheco testified that another officer had requested a warrant check on Dawson because Dawson had run from the police in a previous auto theft recovery at the same address:

Q. [Defense counsel] ... [W]hat knowledge or information did you have, you know, through dispatch before you arrived at Alapai?

A. [Officer Pacheco] Before arriving at Alapai, another officer had run a rap warrant on—on Edward Dawson.

he requested that dispatch perform a warrant check in this case.[4] Officer Kang testified that all his beat partners knew that Dawson was a car-theft suspect and that Officer Kang was looking for Dawson. Officer Kang acknowledged, however, that he did not state over the dispatch radio that Dawson was a car-theft suspect in connection with his request for the warrant check on October 14, 2005, while en route to 1421 Alapai Street.

Officer Pacheco was the first officer to arrive at 1421 Alapai Street. Officer Pacheco testified at the suppression hearing that prior to her arrival, she heard Officer Kang request a warrant check for "a previous UCPV[5] suspect" named Edward Dawson and heard dispatch state that Dawson had a "possible warrant."[6] Officer Pacheco did not know what the "possible warrant" that dispatch had reported was for. Officer Pacheco had heard Dawson's name mentioned before that afternoon but had never seen Dawson before.

Upon arriving at 1421 Alapai Street, Officer Pacheco saw a vehicle matching the description of the stolen vehicle provided by dispatch parked in one of the stalls fronting the apartment complex. Officer Pacheco checked the vehicle's license plate and vehicle identification numbers and confirmed that the vehicle was the one reported stolen. Officer Pacheco then approached a man she saw standing outside one of the apartment units to see if he had any information that would aid her investigation. Officer Pacheco testified that when she approached the man, she did not know he was Dawson, she had no

Q. Okay. What was the reason for running a rap warrant on Edward Dawson at that point?

A. Apparently, he was—he ran from the police previously on an auto theft recovery at that same address.

Q. Okay. So did you have information that this Edward Dawson was at this Alapai Street address—

A. No.

Q.—before you got there?

A. No, sir.

Q. But just—what, I mean, I'm to figure out why did Edward Dawson's name even come up.

A. Another officer ran it, because he had run from the police previously—previously at that address.

basis to suspect that the man was engaged in any criminal activity, and she did not consider the man to be a suspect in her investigation. She stated that the man could have been a witness or an innocent bystander.

Officer Pacheco asked the man for his name and he responded, "Eddie Dawson." Officer Pacheco immediately recognized that name from Officer Kang's warrant check request for Edward Dawson. Officer Pacheco asked dispatch to confirm the warrant for Dawson and told Dawson to sit down. According to Officer Pacheco, at that point, she detained Dawson to confirm the warrant and he was not free to leave. Officer Pacheco agreed with defense counsel's assertion that "by detaining Mr. Dawson, [she] suspended [her] investigation into the auto theft recovery case."

Officer Pacheco explained her understanding of the difference between a "possible warrant" and a "confirmed warrant." She testified that a possible warrant means that a computer search by HPD dispatch shows an outstanding warrant for the person. A warrant is confirmed when someone personally verifies that the physical paper warrant is still in the files located at HPD or the Sheriff's Department. Officer Pacheco testified in relevant part as follows:

> Q. [Defense counsel] Now, what does it mean for someone to have a possible warrant?
>
> A. [Officer Pacheco] That means that the dispatch shows the person has a warrant, but it needs to be confirmed.
>
> Q. It means the person may or may not have a warrant?
>
> A. No, it means that the person—it shows that the person has a warrant in their records, but we don't arrest until it's confirmed.
>
> Q. And—
>
> A. They need to make sure it's actually there.
>
> Q. So let me understand. It means—your testimony says that it means they had a warrant at one time or another?
>
> A. No, that means that right now there's a warrant for the arrest of the suspect.

> . . . .
>
> Q. . . . [I]n order to confirm the warrant, somebody actually has to go in and pull the piece of paper, pull a physical piece of paper?
>
> A. Yes, sir.
>
> Q. And is it correct the physical warrant may be either with HPD or with the sheriff's department?
>
> A. Yes, sir.
>
> Q. . . . . When an officer calls dispatch for a warrant check, the first thing that happens is dispatch pulls up potentially a possible warrant on the dispatcher's computer?
>
> A. Yes, sir.
>
> Q. And then—I don't know, does the officer have to request a confirmation?
>
> A. Yes, sir.
>
> Q. All right. So the dispatch does not automatically ask for the confirmation?
>
> A. Yes, sir.
>
> . . . .
>
> Q. . . . . When you call for the confirmation, dispatch has to have somebody go look for the paper warrant[?]
>
> A. Yes, sir.
>
> Q. And this person either finds it or they don't find it, and they relay that back to the dispatch?
>
> A. Yes, sir.
>
> Q. And then dispatch comes back to you and says yes or no?
>
> A. Yes, sir.

Officer Pacheco stated that she will detain persons for whom dispatch reports a possible warrant, but she will not handcuff them. She testified that it was HPD's standard procedure not to arrest someone based on the possible warrant revealed through the computer check, but only to arrest after the existence of the physical warrant was confirmed. Officer Pacheco had experienced the situation in which a possible warrant was not confirmed because the "hard copy" could not be found. Officer Pacheco acknowledged that possible reasons why a warrant would not be confirmed included the cancellation of the warrant and time lags between when a

warrant is served and when it is removed from the computer system. Officer Pacheco stated that the time necessary to confirm a warrant varies—it could be fast or could take 15, 20, or 25 minutes. An officer requesting a warrant confirmation does not know in advance how long it will take.

■ In this case, it took approximately four minutes for the outstanding arrest warrant for Dawson to be confirmed.[7] Officer Pacheco testified that while awaiting confirmation of the warrant, Dawson kept putting his hands in his pockets. Officer Pacheco told Dawson to stop reaching into his pockets, but Dawson said he had to get a screwdriver. Officer Pacheco saw Dawson remove a glass pipe from his pocket and place the pipe in a plastic bag behind him. Officer Pacheco recognized the glass pipe as a pipe commonly used to smoke crystal methamphetamine. Officer Pacheco did not take any action upon seeing Dawson remove the glass pipe but waited until a back-up officer arrived.

Officer Kang arrived at around this time. As Officer Kang was approaching Officer Pacheco and Dawson, Officer Kang heard Officer Pacheco telling Dawson to keep his hands out of his pockets and saw Dawson take an object from Dawson's pocket and place it in a plastic bag. Officer Kang could not tell what the object was. After dispatch confirmed the outstanding warrant, Officer Pacheco placed Dawson under arrest for the warrant and "the drugs." Officer Kang assisted in arresting Dawson and recovering the glass pipe. The outstanding warrant was a bench warrant issued by circuit court Judge Rhonda A. Nishimura on October 3, 2005, for Dawson's failure to appear at a calendar call on pending third-degree theft and third-degree assault charges, with a bail amount of $3,000.

## II.

The circuit court denied Dawson's motion to suppress evidence. The court concluded in relevant part:

7. The circuit court found that Officer Pacheco approached Dawson at approximately 12:28 p.m. and that dispatch confirmed the outstanding warrant for Dawson at 12:32 p.m. Dawson does

In the instant case, the police officers had specific and articulable facts to temporarily detain Defendant Dawson based on a reasonable suspicion that there was an outstanding warrant for his arrest and that he had been involved in an automobile theft. A car that was reported stolen was in fact found by Officer Pacheco at 1421 Alapai Street. Officer Kang knew Defendant Dawson was a suspect involved with car thefts. On prior occasions, Dawson had run from Police when HPD officers were sent to 1421 Alapai to investigate car thefts. For these reasons, it cannot be said that Defendant was not a suspect for the auto theft. Officer Kang specifically requested the warrant check because he knew that: (1) Defendant Dawson was seen in the past at 1421 Alapai Street[;] (2) Defendant Dawson was a suspect in other car theft cases; (3) he recalled that there was a warrant for Defendant Dawson and wanted to confirm that the warrant was still outstanding. The State asserts that the police did not detain Defendant Dawson solely to perform the check for outstanding warrants. Officer Pacheco's investigation was still in progress when the warrant confirmation was received. In requesting the warrant check prior to his arrival at the scene, Officer Kang was attempting to minimize the length of any detention of Defendant Dawson.

Officer Pacheco [sic] actions during the warrant check were completely appropriate. She had to watch Defendant Dawson closely because he was placing his hands into his front pants pockets. For the safety of herself and Officer Kang, Officer Pacheco instructed Defendant Dawson to keep his hands out of his pockets. Despite this instruction, Defendant Dawson chose to place his hands into his pockets for a second time. After removing his hands from his pockets a second time, Defendant Dawson voluntarily removed a glass pipe with his right hand from his right pants pocket. He then reached for a plastic bag

not challenge these findings and thus we are bound by them. *Bremer v. Weeks*, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004).

behind him in an attempt to conceal the glass pipe with residue into it. Because of her training and experience, Officer Pacheco quickly recognized what the glass pipe was. The discovery of the pipe was not the result of any search conducted by either officer. The pipe was discovered before Officer Pacheco and Officer Kang received confirmation of the outstanding warrant. Officer Pacheco's actions were in no way an attempt to lengthen Defendant Dawson's detention prior to receiving confirmation on the warrant. Based upon the confirmed warrant and the charge of Promoting a Dangerous Drug in the Third Degree, Defendant Dawson was arrested and the glass pipe was recovered and submitted as evidence.

ACCORDINGLY, Defendant Dawson's Motion to Suppress Evidence and Statements is hereby denied.

## STANDARD OF REVIEW

### Motions to Suppress Evidence

■■■ A trial court's ruling on a motion to suppress evidence is reviewed *de novo* to determine whether the ruling was "right" or "wrong." The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

*State v. Spillner,* 116 Hawai'i 351, 357, 173 P.3d 498, 504 (2007) (citations omitted).

Appellate review of factual determinations made by the trial court deciding pretrial [suppression] motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclu-

sions of law are reviewed under the right/ wrong standard.

*State v. Balberdi,* 90 Hawai'i 16, 20–21, 975 P.2d 773, 777–78 (App.1999) (quoting *State v. Anderson,* 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)).

## DISCUSSION

Both Dawson and the State agree that the principal issue raised in this appeal is whether the existence of the "possible" outstanding warrant revealed by the computer check constituted sufficient reasonable suspicion to detain Dawson. Before we address this question, however, we must determine when Dawson was first seized.

### I.

■■■ The police may temporarily seize or detain an individual to investigate possible criminal behavior based on reasonable suspicion, even if there is no probable cause for an arrest. *Spillner,* 116 Hawai'i at 357–58, 173 P.3d at 504–05; *State v. Melear,* 63 Haw. 488, 493, 630 P.2d 619, 624 (1981). To justify an investigative detention under the reasonable suspicion standard, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Spillner,* 116 Hawai'i at 357, 173 P.3d at 504; *Melear,* 63 Haw. at 493, 630 P.2d at 624.

■■■ It is clear that "not every street encounter between the police and the public constitutes a 'seizure.'" *State v. Tsukiyama,* 56 Haw. 8, 12, 525 P.2d 1099, 1102 (1974). "Only when the officer, by means of physical force or show of authority[,] has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (quoting *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868). A court must evaluate the totality of the circumstances in determining whether a defendant was seized. *Id.* A defendant is seized "'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.'" *State v. Quino,* 74 Haw. 161, 169, 840 P.2d 358, 362 (1992)

(quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

Relying on *Quino,* Dawson argues that he was seized the moment that Officer Pacheco walked up to him and asked his name. Dawson contends that because at this point Officer Pacheco did not know his identity, Officer Pacheco had no basis, much less reasonable suspicion, to detain him. The State, relying on *Tsukiyama,* contends that Dawson was not seized or detained until after Dawson identified himself and Officer Pacheco recognized Dawson's name and directed him to sit down. We agree with the State.

A.

In *Tsukiyama,* 56 Haw. at 12–17, 525 P.2d at 1102–05, the Hawai'i Supreme Court held that the on-the-street questioning of Tsukiyama, which included a request for identification, did not constitute a detention or seizure of Tsukiyama. At about 1:00 a.m., police officers encountered Tsukiyama among a group of people gathered around three parked vehicles, one of which appeared to be stalled. *Id.* at 9–10, 525 P.2d at 1100–01. Officer Kaalele asked Tsukiyama if he knew to whom the third parked vehicle belonged. *Id.* at 10, 525 P.2d at 1101. When Tsukiyama acknowledged owning the vehicle, Officer Kaalele asked who owned the bicycle in the back of the vehicle, and Tsukiyama responded that the bicycle belonged to one of his sons. *Id.* Officer Kaalele then asked Tsukiyama if he had some kind of identification, and Tsukiyama said that it was in the glove compartment of his car. *Id.* Officer Kaalele asked Tsukiyama if he would get it, and Tsukiyama proceeded to enter the vehicle and open the glove compartment. *Id.* As Tsukiyama did so, Officer Kaalele saw the butt of a revolver in the glove compartment and restrained and arrested Tsukiyama after a struggle. *Id.* at 11, 525 P.2d at 1101. A gun and drugs were recovered from the glove compartment and other areas of the vehicle, which led to Tsukiyama's prosecution and conviction. *Id.* at 8–11, 525 P.2d at 1100–01.

The supreme court affirmed the trial court's denial of Tsukiyama's motion to suppress evidence. *Id.* at 18, 525 P.2d at 1105. The issue on appeal was whether the recovery of the contraband from Tsukiyama's vehicle was the fruit of an unlawful detention. The court framed the issue as whether Tsukiyama had been seized or detained by the police at any time before Officer Kaalele saw the gun in the glove compartment. *Id.* at 11, 525 P.2d at 1101–02. In support of its conclusion that Tsukiyama had not been seized or detained before Officer Kaalele saw the gun, the court noted, among other things, that: 1) "Officer Kaalele's questions to the defendant were not overbearing or harassing in nature, and the officer did not make a show of authority, make any threats or draw a weapon"; and 2) Officer Kaalele and the other officers at the scene did not know Tsukiyama before he was arrested. *Id.* at 13, 525 P.2d at 1102–03.

The supreme court stated that not every street encounter or personal intercourse between the police and the public constitutes a seizure. *Id.* at 12, 525 P.2d at 1102. The court held that "[t]he informal questions addressed to [Tsukiyama] by Officer Kaalele . . . [was] only a minimal intrusion on his privacy and did not rise to the level of a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 13, 525 P.2d at 1103. The court reasoned that "there is no constitutional objection for a policeman merely to inquire of a person on the streets in a proper manner when the individual to whom the questions are addressed is under no compulsion to cooperate." *Id.* It concluded that "mere field interrogation, without more, by a police officer does not involve 'detention' in the constitutional sense so long as the officer does not deny the individual the right to move." *Id.* at 14, 525 P.2d at 1103.

Consistent with the decision in *Tsukiyama,* the United States Supreme Court and courts from other jurisdictions have similarly concluded that general on-the-scene questioning by a police officer does not constitute a seizure. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (stating that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is

willing to answer some questions, [or] by putting questions to him if the person is willing to listen"); *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (stating that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"); *In re Manuel G.,* 16 Cal.4th 805, 66 Cal.Rptr.2d 701, 941 P.2d 880, 883, 889–91 (1997) (same); *People v. Daniels,* 160 Mich. App. 614, 408 N.W.2d 398, 400 (1987) ("[A] police approach for questioning on the street amounts to a consensual encounter, not a *Terry* stop, unless there exist intimidating circumstances leading the person to reasonably believe he was not free to leave. . . ."); *State v. Mitchell,* 638 So.2d 1015, 1016 (Fla. Dist.Ct.App.1994) (stating that an officer may address questions to anyone on the street and that such questioning will usually constitute a consensual encounter rather than a stop as long as the officer does not attempt to prevent the person from exercising his right to walk away).

### B.

In *Quino,* 74 Haw. at 163–64, 840 P.2d at 360, the Hawai'i Supreme Court addressed the legality of HPD's "walk and talk" drug interdiction program. Under this program, narcotics/vice officers, without reasonable suspicion, would approach arriving passengers at the airport with the intent and purpose of investigating the passengers for drug trafficking. *Id.* at 163–64, 840 P.2d at 360. "Utilizing questions that gradually became more intrusive, the officers sought to bootstrap their investigation into discovery of possible criminal activity by the [passengers]." *Id.* at 172, 840 P.2d at 363. The officers were trained to ask a pre-determined series of questions leading to requests for consent to search the passengers' luggage and pat down their bodies. *Id.* at 164–65, 840 P.2d at 360.

The supreme court held that the situation presented by the "walk and talk" program was substantially different from the "field interrogation" found permissible in *Tsukiyama. Id.* at 171–72, 840 P.2d at 363. The court explained:

Quino's situation differs substantially from *Tsukiyama* because [the police officers in *Quino* ] deliberately initiated their encounter with Quino and his companions for the specific purpose of investigating possible drug trafficking by them. Utilizing questions that gradually became more intrusive, the officers sought to bootstrap their investigation into discovery of possible criminal activity by the group. By contrast, the officers in *Tsukiyama* came upon the men by happenstance. The questions asked were general, non-intrusive and limited to a request for identification. No one in the group was under investigation for specific criminal activity until the gun was observed in the glove compartment.

*Id.* at 171–72, 840 P.2d at 363.

The court held that in the "walk and talk" situation,

once the stop turned from general to inquisitive questioning, a reasonable person in Quino's position would not have believed that he was free to ignore the officer's inquiries and walk away. Although no physical force was used, given the totality of the circumstances, we hold that a seizure took place within the meaning of article I, section 7 of the Hawai[']i Constitution.

*Id.* at 173, 840 P.2d at 364.

### C.

We conclude that Officer Pacheco's initial encounter with Dawson was a non-intrusive, on-the-street "field interrogation" found permissible in *Tsukiyama.* It was far different from the staged, police-controlled "walk and talk" encounter found unlawful in *Quino,* in which police officers deliberately targeted arriving passengers and questioned them for the specific purpose of developing evidence that they were drug traffickers. *See Quino,* 74 Haw. at 172–73, 840 P.2d at 363–64. Accordingly, *Tsukiyama* is the controlling precedent for this case.

When Officer Pacheco approached Dawson, she did not know who Dawson was and did not view him as a suspect in her auto theft recovery investigation. Officer Pacheco's purpose in approaching Dawson was to

gather information about the stolen car by seeing if Dawson knew anything about it. Unlike the "walk and talk" program, Officer Pacheco did not approach Dawson for the purpose of targeting him for investigation as part of a staged, pre-planned attempt to secure incriminating evidence against him. There is no evidence to suggest that Officer Pacheco drew her weapon, made any coercive displays of authority, or questioned Dawson in an overbearing or harassing manner. Instead, the evidence shows that Officer Pacheco approached Dawson as a potential witness who might be able to assist her in her investigation and that in that context, she asked him for his name and identifying information.

Under these circumstances, Dawson was not seized or detained when Officer Pacheco initially approached him and asked for his name. Rather, we conclude that Dawson was not seized until *after* he had disclosed his identity and Officer Pacheco realized who Dawson was and instructed him to sit down. It was only when Officer Pacheco directed Dawson to sit down that Officer Pacheco, by means of her show of authority, restrained Dawson's liberty and a reasonable person in Dawson's position would not have felt free to leave.

## II.

The police are authorized to arrest a person on an outstanding bench warrant. Indeed, Hawaii Rules of Penal Procedure (HRPP) Rule 9(c)(3) provides that a warrant "shall be executed without unnecessary delay by the arrest of the defendant." Dawson does not dispute that the outstanding warrant on which Dawson was arrested was valid and that a valid warrant constitutes probable cause to arrest.

■ The decisive question raised in this appeal is whether Officer Pacheco's knowledge that a computer check by dispatch had revealed an outstanding warrant for Dawson was sufficient to constitute reasonable suspicion to detain Dawson. We conclude that such knowledge, at minimum, provided Offi-

cer Pacheco with reasonable suspicion. Thus, once Officer Pacheco learned that the man she had approached was Dawson, Officer Pacheco was authorized to detain him. Accordingly, the circuit court properly determined that Dawson's detention was lawful.[8]

### A.

■ The Hawai'i courts have not previously addressed the situation presented by this case. Previous cases have addressed the situation in which a warrant check was initiated or contemplated *after* the defendant was already detained in connection with an investigation of offenses unrelated to the warrant. The rule that emerged from these cases is that the police may conduct a warrant check pursuant to a lawful detention as long as the warrant check does not prolong the detention beyond the time necessary to perform the investigation that justified the detention.

In *State v. Barros*, 98 Hawai'i 337, 344, 48 P.3d 584, 591 (2002), the Hawai'i Supreme Court held that "an officer is not prohibited from requesting a warrant check incident to the issuance of a citation for a traffic violation when the check does not prolong the length of time needed to issue a citation."

In *State v. Silva*, 91 Hawai'i 111, 117, 979 P.2d 1137, 1143 (App.1999) (*Silva I*), this court held that where the police had probable cause to arrest the defendant for a petty misdemeanor and a violation, and where under Hawaii Revised Statutes (HRS) § 803–6 (1993), the existence of outstanding arrest warrants was relevant to the officer's decision on whether to issue citations or arrest for these offenses, the police were authorized to conduct a warrant check. In support of our holding, we noted that the United States Supreme Court had "seemingly approved" and other courts had "generally upheld" the use of warrant checks to determine whether the person subject to a valid investigatory stop was wanted. *Id.* at 118, 979 P.2d at 1144. The Hawai'i Supreme Court affirmed the result reached by this court in *Silva I*.

8. Dawson challenges a number of the circuit court's findings of fact and conclusions of law. Our response to the challenges that are material are subsumed within our analysis. Thus, we find

it unnecessary to separately address each of Dawson's challenges to the circuit court's findings of fact and conclusions of law.

*State v. Silva,* 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999) (*Silva II* ). However, the supreme court clarified that it did not read this court's majority opinion "as generally allowing the police to prolong the detention of individuals subjected to brief, temporary investigative stops—once such stops have failed to substantiate the reasonable suspicion that initially justified them—solely for the purpose of performing a check for outstanding warrants." *Id.*

In *State v. Ramos,* 93 Hawai'i 502, 508, 6 P.3d 374, 380 (App.2000), this court held that the initial detention of Ramos was lawfully based on reasonable suspicion that Ramos may have been chasing someone with a knife. However, after the police investigation had dispelled this reasonable suspicion, the police continued to detain Ramos to obtain identification from him that they could have used to check for outstanding warrants. *Id.* at 509–12, 6 P.3d at 381–84. This court held that the continued detention of Ramos without reasonable suspicion in order to demand identification from him was unlawful. *Id.* at 510–11, 6 P.3d at 382–83.

### B.

Dawson's contention that these cases support his argument is unconvincing. In *Barros, Silva I and II,* and *Ramos,* the investigating officers had no information about whether the defendants had outstanding warrants before the defendants were detained. In *Barros* and *Silva I and II,* the warrant checks were initiated after the defendants were detained, and in *Ramos,* the identification information that could have been used to conduct a warrant check was requested after the defendant was detained. In Dawson's case, Officer Pacheco knew that a computer check by HPD dispatch had revealed an outstanding warrant for Dawson *before* Dawson was detained. We therefore consider a question not addressed by the previous cases, namely, whether Officer Pacheco's knowledge that an HPD computer check revealed an outstanding warrant for Dawson constituted reasonable suspicion to support Dawson's detention. We hold that it did.

Other jurisdictions have concluded that computer checks which revealed outstanding warrants not only constitute reasonable suspicion to detain, but satisfy the more stringent standard of probable cause to arrest. *United States v. Miller,* 382 F.Supp.2d 350, 367–69 (N.D.N.Y.2005) (concluding that outstanding warrant revealed through computer warrant check constituted probable cause to arrest even before the warrant was confirmed), *aff'd,* 265 F. App'x 5 (2d Cir.2008); *State v. Stamp,* 718 So.2d 531, 533 (La.Ct. App.1998) (concluding that outstanding arrest warrant revealed through computer check established probable cause to arrest); *State v. Walkin,* 802 So.2d 1169, 1171 (Fla. Dist.Ct.App.2001) (same); *Gibson v. State,* 733 N.E.2d 945, 954 (Ind.Ct.App.2000) (same).

*Miller* is particularly instructive. In *Miller,* a New York federal district court held that a computer check which revealed an outstanding warrant constituted probable cause to arrest Miller, even before the computer check was verified. 382 F.Supp.2d at 356–57, 368–69. Officer Morrow of the Watervliet Police Department saw Miller run a red light, followed him for a short time, then signaled Miller to pull over. *Id.* at 356. Officer Morrow approached Miller's car and obtained license, registration, and insurance information from Miller. *Id.* While Officer Morrow was speaking to Miller, they were approached by a pedestrian named Lewis, Miller's cousin, whom the officer recognized as a member of a violent street gang. *Id.* Each time Lewis approached, Officer Morrow ordered Lewis away. *Id.* Nervous about Lewis's intervention, Officer Morrow returned to his patrol car and asked for backup. *Id.*

At the same time, Officer Morrow used the patrol car's computer to run a license check on the New York State Police Information Network (NYSPIN) and learned that there was an outstanding Troy, New York warrant authorizing Miller's arrest. *Id.* at 356–57. Officer Morrow then contacted dispatch to verify that the Troy warrant was active. *Id.* at 357. It was the policy of the Watervliet Police Department to confirm that the jurisdiction issuing the warrant still wanted the subject before effecting an arrest based on the warrant. *Id.* Nevertheless, before Offi-

cer Morrow received confirmation of the warrant, Officer Morrow ordered Miller out of Miller's car, arrested Miller on the outstanding warrant, and searched him. *Id.* The search of Miller's person incident to his arrest resulted in the recovery of his wallet, a set of odd-shaped keys, and cash. *Id.* Subsequent to these actions, dispatch radioed that the Troy warrant had been confirmed. *Id.* The Troy warrant had been issued by a New York State Judge in connection with a misdemeanor assault charge. *Id.* at 359.

A subsequent search of Miller's car resulted in the recovery of a gun, ammunition, and drugs, including those found in a safe in the trunk that Officer Morrow unlocked with the keys he had seized from Miller. *Id.* at 358. Miller moved to suppress the evidence seized from his person and car. *Id.* at 359–60. The government sought to justify the recovery of this evidence on various grounds, including that 1) there was probable cause to arrest Miller based on the Troy warrant and 2) the searches of Miller's person and the interior of his car were justified as searches incident to Miller's lawful arrest. *Id.* at 360. Thus, one of the issues facing the court was whether Miller's arrest had been lawfully based on probable cause.

Miller argued that Officer Morrow lacked probable cause to arrest him because Officer Morrow arrested Miller before the Troy warrant had been confirmed. *Id.* at 368. The court rejected this argument. Citing numerous decisions of other courts in its circuit, the court held that "probable cause to arrest exists on the basis of a computer hit where there is no evidence that the information contained in the computer was false or invalid." *Id.* at 368–69. The court further held that Officer Morrow's subjective belief that, under Watervliet's policy and state procedures, he lacked authority to arrest Miller absent warrant confirmation was irrelevant. *Id.* at 369. The court concluded that even if the Watervliet policy required confirmation of the warrant before effecting an arrest,

that policy could not alter the court's determination that the outstanding warrant revealed through Officer Morrow's computer check established probable cause for Miller's arrest before the warrant was confirmed. *Id.* The court further noted that the mistaken belief of the police that they lack probable cause to arrest "is irrelevant to whether it legally existed." *Id.* at 366.[9]

### C.

*Miller* supports our conclusion that Officer Pacheco's knowledge that a computer check run by dispatch had revealed an outstanding warrant for Dawson was, at minimum, sufficient to establish reasonable suspicion to detain Dawson.[10] Our conclusion is also supported by the other cited non-Hawaiʻi cases upholding the validity of arrests based on outstanding warrants revealed through computer checks. As in *Miller,* Officer Pacheco was entitled to rely on the "computer hit" to detain Dawson since she was not aware of any evidence suggesting that the computer information was false or invalid. Indeed, Officer Pacheco did precisely what we would want a law enforcement officer to do in her situation. We want officers to execute outstanding arrest warrants on wanted individuals whom the officers encounter. Consistent with HPD's apparent policy, Officer Pacheco proceeded cautiously in detaining rather than arresting Dawson until the outstanding warrant was confirmed.

 It would be anomalous if notwithstanding Officer Pacheco's knowledge that a computer check showed an outstanding warrant for Dawson, Officer Pacheco was powerless to prevent Dawson from fleeing until confirmation of the physical paper warrant could be obtained. As noted by the Hawaiʻi Supreme Court:

> Neither the fourth amendment nor the Hawaiʻi Constitution "require a policeman who lacks the precise level of information

---

9. In an unpublished decision, the United States Court of Appeals for the Second Circuit affirmed the district court's determination that there was probable cause for Miller's arrest. *Miller,* 265 F. App'x at 7.

10. Because the issue raised by Dawson in this appeal only involves whether Dawson's detention was supported by reasonable suspicion, we need not decide whether the computer check revealing the "possible" warrant constituted probable cause to arrest Dawson.

necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

*State v. Kaleohano*, 99 Hawai'i 370, 380, 56 P.3d 138, 148 (2002) (block quote format changed) (quoting *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

The fact that Officer Pacheco did not know how long it would take for the warrant to be confirmed, and that confirmation in certain cases could take as long as 25 minutes, does not affect our analysis. In this case, the length of Dawson's detention before the warrant was confirmed was only approximately four minutes. Thus, Dawson's detention was lawful. We need not determine whether a hypothetical longer detention in another case would be permissible.[11]

### III.

The circuit court ruled that Dawson's detention was justified based on reasonable suspicion that there was an outstanding warrant for his arrest *and* that he had been involved in an automobile theft. Our determination that Officer Pacheco had reasonable suspicion to detain Dawson based on the computer check which revealed an outstanding warrant provides a sufficient basis for us to affirm the circuit court's denial of Dawson's motion to suppress. We therefore decline to address the circuit court's additional conclusion that Dawson's detention was justified based on reasonable suspicion that Dawson had been involved in an automobile theft.

### CONCLUSION

We affirm the January 17, 2007, Judgment of the circuit court.

Dissenting Opinion by FOLEY, P.J.

I respectfully dissent.

On appeal, Dawson asserts that the "existence of a 'possible warrant' did not constitute reasonable suspicion enabling the police to detain Dawson" and, thus, the circuit court "erred in denying Dawson's motion to suppress the pipe containing residue which the police observed during his illegal detention." Dawson contends that in the circuit court's January 16, 2007 Order Denying the Motion by Defendant Dawson to Suppress Evidence and Statements (Order), Findings of Fact (FOF(s)) 1, 4, and 5 were clearly erroneous, and portions of the Conclusions of Law (COLs) were wrong.

On February 15, 2006, Dawson filed a Motion to Suppress Evidence and Statements (Motion to Suppress), in which he sought to suppress "all evidence and statements that constitute 'fruits of the poisonous tree.'" Specifically, Dawson sought to suppress:

1. A three-inch glass pipe seized on October 14, 2005, at approximately 12:30 p.m. at 1421 Alapai Street by [Officer Kang].

2. White residue weighing 0.075 grams, containing methamphetamine, recovered from inside said glass pipe mentioned above, seized on October 14, 2005, at ap-

---

11. We note that at the suppression hearing, Dawson introduced a February 19, 2006, article from the Honolulu Advertiser entitled, "Arrest warrants backlog tops 61,000." The article noted that "[t]o get a handle on the backlog, the Judiciary last year purged more than 25,000 old traffic warrants, some for major violations." Dawson presumably introduced the article to cast doubt on the validity of the information revealed through a computer check for warrants. We fail to see the probative value of this article and there is no indication that the circuit court gave it any weight in rendering its decision. The "purging" of a warrant does not mean that the warrant was invalid; it may simply mean that the State chose to dismiss or not pursue the underlying matter. Thus, even if the article ac- curately reported the Judiciary's "purging" of warrants, the article did not provide a sound basis for attacking the validity of the information revealed through a computer check for warrants.

We are also unpersuaded by the State's attempt to use the article to support its argument. On appeal, the State asserts that Dawson used the article to speculate that from one-third to one-half of the warrants entered into the system have been canceled. The State then attempts to turn Dawson's speculation into an argument that the probability that from one-half to two-thirds of the warrants in the computer system will be confirmed is sufficient to constitute reasonable suspicion. We conclude that the State's reliance on the article is unfounded.

proximately 12:30 p.m. at 1421 Alapai Street by [Officer Kang].

On April 27, 2006, the circuit court heard Dawson's Motion to Suppress (4/27/06 hearing). Dawson and Honolulu Police Department Officers Pacheco and Kang testified at the hearing.

Officer Pacheco testified that on October 14, 2005, she was sent to 1421 Alapai Street to investigate the recovery of a stolen vehicle (the Vehicle). While she was en route to the address, she heard a dispatch report on her police radio that a person named Edward Dawson had a possible warrant. She testified that she was the first officer to arrive at the scene, and she recounted how she found and identified the Vehicle, which was in the parking lot at 1421 Alapai Street.

After Officer Pacheco informed dispatch she had found the Vehicle, she noticed a man standing nearby and approached him to see if he had any information that would aid her investigation. Officer Pacheco testified that she did not know the man, did not have any basis or facts to believe the man was engaged in any criminal activity, and did not consider the man a suspect in her investigation.

Officer Pacheco asked the man for his name, and when he responded "Eddie Dawson," she concluded that this was the person who had been reported to have a possible warrant. Officer Pacheco explained that after she obtained Dawson's name, she detained Dawson and asked dispatch to confirm the warrant. Defense counsel questioned Officer Pacheco about her detention of Dawson:

Q. [Deputy Public Defender:] . . . [T]he first thing you do when you meet Mr. Dawson is you get his name, his social security number and his birth date?

A. [Officer Pacheco:] Yes, sir.

Q. And as soon you hear this, you know this guy has a possible warrant?

A. Yes, sir.

Q. And so you immediately ask him to sit down?

A. Yes, sir.

. . . .

Q. And at this time Mr. Dawson was not free to leave, correct?

A. Correct.

Officer Pacheco described how, during Dawson's detention, she observed Dawson with a glass pipe with a bulbous end, which she believed was drug paraphernalia:

A. [Officer Pacheco:] I asked [Dawson] to sit down, which he did, while I was detaining him to confirm the warrant and while he was there, he kept putting his hand in his pockets, and I asked him to keep his hands out of his pockets. He took his hand out, and then he put it in again, and I said please keep your hands out of your pocket, and while he was—he said he had to get a screwdriver.

Q. Okay.

A. So when he took his hand out, as I was watching him, he had a glass pipe in his right hand. Then he reached back behind him and put it in a plastic bag that was in the back.

. . . .

Q. Okay. Now, you're saying that this item is a pipe. Have you had training and experience in the identification of drug and drug paraphernalia?

A. Yeah, it's a pipe commonly used to smoke crystal methamphetamine.

Officer Pacheco testified that when the warrant confirmation came back approximately six minutes later, she arrested Dawson "for both the drugs and the contempt warrant[ ]."

Officer Kang testified that while he was en route to 1421 Alapai to investigate the Vehicle recovery, he requested a warrant check on Dawson. Officer Kang explained what led him to request a warrant check on Dawson before reaching the Alapai address:

A. [Officer Kang:] I think it was about four months prior to [Dawson's arrest on the instant charges], maybe five months.

Q. [Deputy Public Defender:] Okay.

A. A vehicle was reported stolen, it was inside that lot.

Q. The same lot?

A. Yeah.

Q. Hm-hmm.

A. A gentleman came out of Sandra Domingo's apartment. And it was kind of embarrassing, because I went to confront him, he took off. I chased after him and my partner chased after him, but then we didn't know there was another person in the apartment who then took the truck while we were chasing the other guy.

Q. He then took the truck, you said?

A. He stole the truck again while we were chasing the other guy. So when I started questioning Ms. Domingo, she gave up the name. That's the only reason I even know his name, is from his girlfriend.

Q. All right. That was first time you had seen Mr. Dawson before?

A. I had never even saw him that first time. The first time I saw him, I was attempting a traffic stop on Pauoa Road that had expired—a blue van, everything was expired. He pulls over, gets out and runs into the neighborhood. I started to chase him, and then I see Sandra getting out, so I didn't know if the vehicle was an unreported Code 10, so I just stayed with the vehicle.

. . . .

Q. And the only basis for your interest in him was that you got his name from Sandra Domingo that day?

A. Plus he stole a truck again.

Q. But you didn't see him do that, did you?

A. No, no. I was just told.

Q. That's just your suspicion?

A. That's correct. That's how his name first came up.

Officer Kang testified that once he learned Dawson's name, he "started running [Dawson's] name on a constant basis."

Dawson testified as to events leading up to his arrest on October 14, 2005. Dawson recounted that he and Sandra Domingo had just returned from a trip to a store and he was standing outside her apartment door when he saw Officer Pacheco in the parking lot of the apartment building. Dawson testified that Officer Pacheco quickly approached him and asked him only his name and social security number. After he gave her his name and social security number, Officer Pa-

checo immediately asked him to sit down. On cross-examination, Dawson said he did not know why Officer Pacheco had detained him.

Testimony was elicited from Dawson that he had seen a "transcript" that fixed the length of his detention, before Officer Kang arrived, at six minutes. Upon further examination by the State, Dawson testified that he did not know exactly how long he had been detained by Officer Pacheco, but "[i]t seemed like forever I was sitting down."

On January 16, 2007, the circuit court filed its Order denying Dawson's Motion to Suppress.

On appeal, Dawson contends the circuit court erred at the 4/27/06 hearing by not suppressing evidence of the glass pipe that contained methamphetamine residue.

Dawson claims that FOF 1 in the circuit court's Order was clearly erroneous; FOF 1 reads as follows:

1. On October 14, 2005, [Officer Pacheco] was sent to 1421 Alapai Street on a report of an outstanding stolen vehicle bearing Hawaii plates "JGJ023" which was parked in the lot. She arrived about 12:22 p.m.

Dawson contends that the portion of FOF 1, which states that "[s]he arrived about 12:22 p.m." is clearly erroneous because Officer Pacheco's testimony at the 4/27/06 hearing was that she was assigned at 12:22 p.m., not that she arrived at 12:22. The exact arrival time is not critical to Dawson's Motion to Suppress. FOF 1 is substantially correct and not fatally flawed by any discrepancy between the arrival and assignment times.

Dawson contends that FOF 4 in the circuit court's Order was clearly erroneous; FOF 4 reads as follows:

4. At approximately 12:25 p.m., Officer Leo Kang (hereinafter "Officer Kang") requested a warrant check on Edward Dawson. Officer Kang is familiar with Defendant Dawson and aware that he visits his girlfriend residence [sic] located at 1421 Alapai Street.

Dawson argues that FOF 4 was clearly erroneous because it omitted pertinent facts

and that FOF 4 should have read as follows (Dawson's changes are bracketed and bolded):

4. At approximately 12:25 p.m., **[prior to Officer Pacheco's arrival at 1421 Alapai Street]**, Officer Leo Kang (hereinafter "Officer Kang") requested a warrant check on Edward Dawson. Officer Kang is familiar with Defendant Dawson and aware that he visits his girlfriend['s] residence located at 1421 Alapai Street. **[Officer Pacheco heard Dispatch respond that Dawson had a "possible warrant."]**

These omissions fail to demonstrate a clearly erroneous FOF. The absence of the two statements Dawson believes the circuit court should have included in FOF 4 does not produce a misrepresentation of facts or alter the accuracy of FOF 4 in any material way. The circuit court's finding that Officer Kang requested a warrant check on Dawson at *approximately* 12:25 p.m. based on the officer's knowledge that Dawson's girlfriend lived at 1421 Alapai and that he might encounter Dawson there was not clearly erroneous.

Dawson contends that FOF 5 in the circuit court's Order was clearly erroneous; FOF 5 reads as follows:

5. At approximately 12:28 p.m., Officer Pacheco approaches the male who verbally identifies himself as Edward Dawson with a birthdate of . . . , 1970, with a social security number of. . . . At 12:29 p.m., this information was relayed to dispatch.

Dawson argues that the circuit court omitted facts from FOF 5, making it clearly erroneous, and that FOF 5 should have read as follows (Dawson's changes are bracketed and bolded):

5. At approximately 12:28 p.m., Officer Pacheco approaches the male **[who][.** **In response to Officer Pacheco's question, the male]** verbally identifie[d] himself as Edward Dawson with a birthdate of . . . , 1970, with a social security number of. . . . **[Recognizing that "Edward Dawson" has a possible outstanding warrant, Officer Pacheco suspended her investigation of**

**the auto theft recovery and case, ordered Dawson to sit down, and detained him solely to confirm the "possible warrant."]** At 12:29 p.m., **[this information was relayed to] [Officer Pacheco asked]** Dispatch **[to confirm the "possible warrant."]**

The circuit court's failure in FOF 5 (or elsewhere in the FOFs) to find that (1) Dawson was detained solely for the purpose of waiting for the results of a warrant confirmation check, (2) his detention was prolonged because of the warrant check, and (3) his detention was illegal, was clearly erroneous.

Dawson's point of error as to FOF 5 leads to his point of error that the following portions of the circuit court's COLs were wrong:

### CONCLUSIONS OF LAW

. . . .

In the instant case, the police officers had specific and articulable facts to temporarily detain Defendant Dawson based on a reasonable suspicion that there was an outstanding warrant for his arrest and that he had been involved in an automobile theft. . . . Officer Kang knew Defendant Dawson was a suspect involved with car thefts. On prior occasions, Dawson had run from Police when HPD officers were sent to 1421 Alapai to investigate car thefts. For these reasons, it cannot be said that Defendant was not a suspect for the auto theft. Officer Kang specifically requested the warrant check because he knew that: (1) Defendant Dawson was seen in the past at 1421 Alapai Street, (2) Defendant Dawson was a suspect in other car theft cases, (3) he recalled that there was a warrant for Defendant Dawson and wanted to confirm that the warrant was still outstanding. The State asserts that the police did not detain Defendant Dawson solely to perform the check for outstanding warrants. Officer Pacheco's investigation was still in progress when the warrant confirmation was received. In requesting the warrant check prior to his arrival at the scene, Officer Kang was attempting to minimize the length of any detention of Defendant Dawson.

Officer Pacheco actions [sic] during the warrant check were completely appropriate.... Officer Pacheco's actions were in no way an attempt to lengthen Defendant Dawson's detention prior to receiving confirmation on the warrant.

ACCORDINGLY, Defendant Dawson's Motion to Suppress Evidence and Statements is hereby denied.

Dawson contends the circuit court erred in concluding that his detention was not illegal because "the police officers had specific and articulable facts to temporarily detain [Dawson] based on a reasonable suspicion that there was an outstanding warrant for his arrest"; the officers did not detain Dawson solely for the warrant check, but also because Officer Kang knew that "Dawson was a suspect in other car theft cases" and "Dawson was seen in the past at 1421 Alapai Street"; "Officer Pacheco's investigation was still in progress when the warrant confirmation was received"; and "Officer Pacheco's actions were in no way an attempt to lengthen [Dawson's] detention prior to receiving confirmation on the warrant."

Dawson reasons that police had no "specific and articulable facts," *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), or reasonable suspicion that warranted his detention. Dawson points out that the United States and Hawai'i Constitutions guarantee a person's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV; *see also* Haw. Const. art. I, § 7. Dawson also points out that in contrast to the Fourth Amendment, the Hawai'i Constitution specifically guarantees a person's right to be free from "unreasonable ... invasions of privacy." Haw. Const. art. I, § 7. Dawson contends his detention by police was illegal and the subsequent discovery of the glass pipe was "pursuant only to [Officer] Pacheco's, and later [Officer] Kang's, illegal detention" of him. Citing to *State v. Poaipuni*, 98 Hawai'i 387, 392–93, 49 P.3d 353, 358–59 (2002), Dawson argues that the evidence of the glass pipe and residue should have been suppressed by the circuit court at the 4/27/06 hearing as "fruit of the poisonous tree, since it was discovered as a result of his illegal detention."

It is well established that a "police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. However, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880 (footnote omitted). "This demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18.

At the 4/27/06 hearing, the State made no attempt to support the reliability or credibility of the "possible warrant" response on which Officer Pacheco relied to detain Dawson. On cross-examination, Officer Pacheco acknowledged that on an unspecified number of prior occasions she had been unable to obtain a confirmation after receiving a "possible warrant" response because a paper copy of the warrant could not be found. She also acknowledged that a warrant could not be confirmed if the warrant had been cancelled for some reason. Officer Pacheco stated that in some cases it could take up to twenty-five minutes to receive a warrant confirmation.

Officer Pacheco testified that she does not make an arrest on a "possible warrant" report because she needs "to know first if there is in fact a warrant." During her testimony, Officer Pacheco described her understanding of the warrant check process, but offered no information as to how dependable a "possible warrant" response was or whether a police policy existed that instructed officers to detain a person pending confirmation of a "possible warrant" report.

Q. [Deputy Public Defender:] ... I wanted to make sure how this works. When an officer calls dispatch for a warrant check, the first thing that happens is dispatch pulls up potentially a possible warrant on the dispatcher's computer?

A. [Officer Pacheco:] Yes, sir.

Q. And then—I don't know, does the officer have to request a confirmation?

A. Yes, sir.

Q. All right. So the dispatch does not automatically ask for the confirmation?

A. Yes, sir.

Q. And once the officer asks for a confirmation—oh, and in this case you said after you got—I believe you testified after you got Edward Dawson's personal information, that's when you called in for the confirmation?

A. Yes, sir.

Q. And now just picking up where we left off. When you call for the confirmation, dispatch has to have somebody go look for the paper warrant[?]

A. Yes, sir.

Q. And this person either finds it or they don't find it, and they relay that back to the dispatch?

A. Yes, sir.

Q. And then dispatch comes back to you and says yes or no?

A. Yes, sir.

Q. And this is a standard HPD procedure?

A. Yes, sir.

Q. And it's been a standard HPD procedure since you've been a police officer?

A. Yes, sir.

Q. Now, it can take sometime to confirm a warrant?

A. It could.

Q. But sometimes it's fast?

A. Yes, sir.

Q. But sometimes it might take 15, 20, 25 minutes?

A. It could.

Q. And when you start this procedure confirming a warrant, you don't know how long it's going to take?

A. No, sir.

Q. And in this case, Mr. Dawson's case, do you know—well, was his physical warrant with the sheriffs or with HPD?

A. I don't remember.

Q. So I think I went over it before, but real quickly. Another reason why a war-rant may no longer be confirmed is because it's been previously served?

A. Yes, sir.

Q. And so the reason the warrant's still there is perhaps—well, let me restart. The reason that possible warrant still comes up is because there's a lag time between when the warrant is served and when it's taken off as a possible warrant in the computer system?

A. That's—that may be a reason.

Q. So you certainly don't want to arrest somebody for a warrant that's already been cancelled?

A. Correct.

In its answering brief, the State argues that "the probability that from half to two-thirds of the warrants in the computer system will be confirmed as valid warrants is sufficient reasonable suspicion to detain [Dawson] long enough for dispatch to confirm the actual physical paper warrant." Such statistics, even if they were supported by evidence in the record, do not establish the reasonableness of an "intrusion upon personal liberty." *State v. Goudy*, 52 Haw. 497, 501, 479 P.2d 800, 803 (1971). To support a reasonable suspicion, the State must produce "specific and articulable" facts. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. These facts need to be more "specific and articulable" than an argument on appeal that an intrusion on an individual's liberty will be correct from one-half to two-thirds of the time. It was erroneous for the circuit court to conclude that the officers or the State had demonstrated that a "possible warrant" constituted reasonable suspicion to detain Dawson pending confirmation.

During the 4/27/06 hearing, the circuit court, *sua sponte*, cited two cases it found persuasive regarding the issue of the Motion to Suppress. First, the circuit court mentioned *State v. Barros*, 98 Hawai'i 337, 48 P.3d 584 (2002). In *Barros*, the Hawai'i Supreme Court held that "an officer is not prohibited from requesting a warrant check in a traffic violation stop when the check does not prolong the length of time needed to issue the citation." *Id.* at 338, 48 P.3d at 585. The *Barros* court made it clear that authori-

ty to detain a person to run a warrant check ends when the officer has concluded the purpose of the stop:

In *State v. Silva*, 91 Hawai'i 80, 979 P.2d 1106 (1999) [hereinafter *Silva II* ], *aff'g* [*State v. Silva*, 91 Hawai'i 111, 979 P.2d 1137 (1999) (*Silva I* ) ], we noted that we "d[id] not read [*Silva I* ] as generally allowing the police to prolong the detention of individuals subjected to brief, temporary investigative stops ... solely for the purpose of performing a check for outstanding warrants." *Silva II*, 91 Hawai'i at 81, 979 P.2d at 1107. We now hold that the police may not do so.

*Id.* at 342, 48 P.3d at 589 (some bracketed material in original and some added; ellipsis in original; footnote omitted).

The circuit court also referred to *State v. Rife*, 133 Wash.2d 140, 943 P.2d 266 (1997). In *Rife*, the Supreme Court of Washington found that a police officer lacked statutory authority to detain a person stopped for a traffic offense for the purpose of running a warrant check. 133 Wash.2d at 150–51, 943 P.2d at 270–71. In response to that decision, the Washington state legislature amended Washington Revised Code § 46.61.021 to permit an officer to detain a person to check for any outstanding warrants:

(2) Whenever any person is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time necessary to identify the person, *check for outstanding warrants*, check the status of the person's license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction.

1997 Wash. Sess. Laws, 1st Sp. Sess., Ch. 1 § 1 (emphasis added); *State v. Barnes*, 96 Wash.App. 217, 221 n. 2, 978 P.2d 1131, 1134 n. 2 (1999).

In *Barros*, the Hawai'i Supreme Court distinguished its decision from *Rife*:

In *Rife*, the Washington Supreme Court interpreted Washington's statute to find that the police lacked statutory authority to run a warrant check after stopping the pedestrian for jaywalking. *Rife*, however, is distinguishable from this case. In *Rife*, the police detained the defendant for five to ten minutes while the initial check was made and another five to ten minutes while verification was made. In the instant case, Barros was not detained for any longer than it took to issue the citation.

*Barros*, 98 Hawai'i at 341, 48 P.3d at 588.

In *Barros*, the stop was made for a reason (traffic violation) other than a warrant check, and the Hawai'i Supreme Court held that the police officer had not "prolong[ed] impermissibly the stop in order to allow dispatch to complete the warrant check he requested." *Id.* at 342–43, 48 P.3d at 589–90.

It was erroneous for the circuit court to conclude that a "possible warrant" provided reasonable suspicion to detain Dawson pending confirmation. Detaining Dawson beyond the objective of investigating the auto theft matter exceeded that degree of intrusion absolutely necessary under the circumstances of this case. *See State v. Silva*, 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999).

The conclusion that reasonable suspicion for detaining Dawson could be found in Officer Kang's knowledge that Dawson was a suspect in a past auto theft was also erroneous. A criminal record alone cannot justify detaining an individual for questioning where there are no additional facts to suggest that a crime actually has been or is about to be committed. *United States v. Jerez*, 108 F.3d 684, 693–94 (7th Cir.1997). Officer Kang's reliance on his suspicion that Dawson may have been involved in a prior auto theft case did not provide reasonable suspicion to detain Dawson in the investigation at hand. The Hawai'i Supreme Court has recognized the unlawfulness of police officers detaining a person in a *Terry*-type situation based only on knowledge of prior arrests:

If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a reasonable suspicion, and of the need that such stops be justified in

light of a balancing of the competing interests at stake.

*State v. Kaleohano,* 99 Hawai'i 370, 377, 56 P.3d 138, 145 (2002) (*quoting United States v. Sandoval,* 29 F.3d 537, 543 (10th Cir. 1994)).

That Dawson had been seen in the past at 1421 Alapai Street did not indicate he was involved in the theft of the Vehicle. The Alapai address is that of Punchbowl Homes, an apartment complex presumably accessible to the public and the residence of Dawson's girlfriend.

The circuit court also erred in concluding that Officer Pacheco's auto theft investigation was still in progress during Dawson's detention. Officer Pacheco stated in her testimony at the 4/27/06 hearing that she suspended her investigation into the auto theft recovery case for the purpose of detaining Dawson to conduct a warrant confirmation check on him.

Dawson's glass pipe and the drug residue therein were fruits of an illegal detention. Therefore, it was erroneous for the circuit court to deny Dawson's Motion to Suppress these items. *See State v. Fukusaku,* 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997).